**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES PORTER and MARILYNN SANKOWSKI | CIVIL ACTION |
| v. | NO. 13-2008 |
| CITY OF PHILADELPHIA, et al. | |

<u>**MEMORANDUM RE: POST-TRIAL MOTIONS**</u>

Baylson, J. August 31, 2018

## I.      Introduction

This case involves a most egregious violation of First Amendment rights, in the context

of a sheriff's sale.  After a jury verdict in favor of Plaintiffs, the Defendants, City of Philadelphia

and Edward Chew, moved for judgment as a matter of law, a new trial, or remittitur, asserting

errors in the Court's jury instructions and in allowing a <u>Monell</u> claim to proceed at trial.

## II.      Factual Background

The Court reviews the facts introduced at trial in the light most favorable to Plaintiffs.

Through Porterra, LLC, Plaintiff James Porter owned a property at 1039-55 Frankford Avenue in

Philadelphia, which was subject to foreclosure and scheduled to be sold at a sheriff's sale on

January 4, 2011.  (N.T. 4/3/18 183:19-184:1, ECF 98; N.T. 4/4/18 114:3, ECF 99).  Porter and

various members of his family attended the sale on that date, which was held in a large ballroom

in West Philadelphia.  Porter's wife, Debra, had a $2.8 million mortgage on the property, and

Debra had filed a declaratory judgment action in the U.S. District Court for the Eastern District

of Pennsylvania regarding this mortgage, Docket No. 10-7243.  (<u>Id.</u> 183:24-25; 220:24-25).

Prior to the sheriff's sale, Porter had gone to the Sheriff's office on several occasions, trying to

prevent the sheriff's sale of the property proceeding, and alternatively attempting to ensure that

whoever bought the property at the sheriff's sale was aware of the pending declaratory judgment

action. On the afternoon before the sale, Porter's attorney, Alan Nochumson, e-mailed the attorney for the bank holding the mortgage to ensure that there would be an announcement of the existence of the pending federal lawsuit. (N.T. 4/2/18 198:5-24, ECF 97). Nochumson subsequently e-mailed Porter the following:

> Jim, I'm just confirming what I told you to do today if the bank does not announce Deborah's lawsuit at the sale. You are to say that Deb has filed a federal lawsuit claiming she has an unrecorded mortgage which would survive the sheriff's sale. While you're at it, you might as well also mention that you and Deborah have a billboard easement on the property.

(Id. 199:16-22).

When the attorney for the bank did not arrive, and the sale of the property was announced by the representative of the Sheriff's office conducting the sale, Porter stood up and began reading the e-mail from Nochumson. (N.T. 4/3/18 229:6-9). Within a very short period of time, which various witnesses have estimated as between three and thirty seconds of Porter beginning to read the announcement, Defendant Ed Chew, an attorney for the Sheriff's department, along with Defendant Deputy Sherriff Daryll Stewart, ran at Porter, yelling, and motioned to several sheriff's deputies, who pulled Porter by the collar, put Porter in a chokehold, placed him in handcuffs, hit him with a stun gun, and eventually dragged him from the room. (N.T. 4/2/18 111:6; 147:2-6; N.T. 4/3/18, 229:11-233:23). Porter later sought medical attention, as did at least one of the deputies. (N.T. 4/3/18 236:25-237:1; 263:2-3).

Chew also grabbed Porter's mother, Marilynn Sankowski, who sustained bruises from the encounter. (N.T. 4/2/18 72:21-73:3; 74:17-20).

Porter was jailed and later charged criminally in state court. After a jury trial, at which he represented himself, he was convicted of resisting arrest. (Id. 117:21).

### III.    Procedural History

A detailed record of the events leading up to the trial will be helpful in setting the context for the trial itself, and for assessing the Defendants' post-trial assertions of error.

In December 2012, Plaintiffs Porter and Sankowski filed this action in the Philadelphia Court of Common Pleas, which alleged eleven counts of civil rights violations, including one claim of <u>Monell</u> liability,[1] against Defendants City of Philadelphia; Barbara Deeley; Daryll Stewart; Ed Chew; William Bengochea; Guerino Busillo; James McCarrie; Angellinel Brown; and Paris Washington.  (Compl., ECF 1).  On April 16, 2013, Defendants removed to this Court. (Notice of Removal, ECF 1).

---

[1] In many civil rights cases, plaintiffs assert claims against individuals under 42 U.S.C. § 1983, and claims for liability against a municipality or a supervisor/manager under the theories developed in the landmark Supreme Court case, <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978), which concerned policies of New York City agencies requiring pregnant employees to take leaves of absence before such leaves were medically necessary.  The Supreme Court held that "[l]ocal governing bodies…can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where… the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>Id.</u> at 690.  The Supreme Court held that a policy or custom was a requirement for establishing municipal or supervisory liability: "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort…a municipality cannot be held liable solely because it employs a tortfeasor… in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." <u>Id.</u> at 691.  <u>Monell</u> remains good law, and plaintiffs must show the existence of a policy or custom to establish municipal liability.  <u>See, e.g.</u>, <u>Lesende v. Borrero</u>, 752 F.3d 324, 336 (3d Cir. 2014) (jury made a finding that liability stemmed from unconstitutional policy or custom).  By contrast, the elements of proof for § 1983 claims against individuals acting under color of state law are less onerous.

The Court's frequent reference to the "<u>Monell</u> claim" in this Memorandum refers to the doctrine described above.  In this case, as detailed <u>infra.</u>, Porter appeared during all the pretrial proceedings to be focusing his facts and legal arguments on the liability of the individual defendants, and had not made any specific discovery requests to support his <u>Monell</u> claim, at least that the Court is aware of.

This case was placed in suspense on April 22, 2013 because of the underlying criminal matter for which Porter was being prosecuted. (Order, ECF 2). Defendants filed their answer on December 23, 2013. (Answer, ECF 5).

## A.    Pretrial Proceedings

No progress was made in this litigation until early 2017, by which time the criminal case had been concluded. Porter's then-attorney, Brian Zeiger, moved to withdraw as counsel on February 8, 2017, and moved to remove the case from suspense that same day. (Mot. to Withdraw, ECF 10; Mot. to Remove from Suspense, ECF 11). The Court granted both motions allowing Zeiger to withdraw as counsel for Porter and removing the case from suspense on March 28, 2017. (Order, ECF 16). Thereafter, Zeiger continued to represent Sankowski but Porter represented himself pro se.

The Court recognized that Porter, as a pro se litigant, was unfamiliar with court procedures, but extremely tenacious in pursuing his case. His consistent factual assertions also demonstrated that if his version of events was credible, he suffered a most serious civil rights violation. Despite the case management challenges of Porter continually trying to make this case more complex than necessary, and to introduce irrelevant facts and legal theories, the Court closely supervised the pretrial proceedings so that Porter could receive a fair trial of the "kernel" of his complaint that he suffered substantial loss of his constitutional rights, plus physical injury as a result of his attempting to speak at a sheriff's sale regarding a property in which he had a very substantial financial interest.

At this point in the litigation, with the case out of suspense and Porter now representing himself, Porter was insistent on amending his complaint. However, his motion was defective for a number of reasons. Porter wanted to add additional defendants, and additional grounds, which the Court concluded were unnecessary, untimely or legally improper. Most fundamentally,

4

Porter wanted to re-litigate issues as to the bank's conduct leading up to the foreclosure sale, asserting that his rights had been violated. All of these issues had been determined against Porter in state court litigation. See Commerce Bank, N.A. v. Porterra, LLC, Court of Common Pleas Philadelphia County, February Term 2007, No. 03257. The Court held a number of pretrial hearings, many more than in most cases, and issued various orders after most, if not all, of these all conferences. By Order dated September 11, 2017 (ECF 27), the Court summarized the procedural situation existing at that time, including reasons why the Court decided not to allow Porter to file an amended complaint to add additional defendants and irrelevant facts. The Court noted that Porter had previously been given leave to file an amended complaint but had failed to do so. See id.

On September 25, 2017, the Court held an extensive pretrial conference with Porter, and the counsel for his mother and co-plaintiff, Marilynn Sankowski, and defense counsel. A number of issues pertaining to discovery had arisen. The Court went into great detail about the conduct of Mr. Porter as a pro se plaintiff. The Court's Order resulting from this conference likewise went into great detail regarding how discovery should be conducted, and set deadlines for discovery, dispositive motions, and a trial pool date of January 15, 2018. (Order, ECF 30).

Another hearing was held on October 10, 2017 in which the Court reviewed the procedural status at that time and ruled that Porter's efforts to add an expansive conspiracy count to the Complaint was not appropriate. In the Order issued subsequent to that hearing (ECF 41), the Court stated, "this Court has determined that Mr. Porter is entitled to fair discovery on his claims of excessive force and denial of free speech, and he may pursue his claim of civil conspiracy limited to what happened on the day of the Sheriff's sale." Id. ¶ 4. The Court denied Porter's request for extensive discovery into what had happened prior to the Sheriff's sale.

This Order then went on with further details about what discovery would take place on specific dates, in much more detail than usual in a case where both parties are represented by counsel. The Court noted in paragraph 6 that Mr. Porter had never served a Rule 34 request for documents on counsel for the City but agreed to treat Porter's request at the hearing for documents as a Rule 34 request although coming late in the litigation. The Court therefore ordered that the "City produce documents in the custody of the Sheriff's Department or the Police Department relating to the incidents involving Plaintiff on January 4, 2011 leading up to [Porter's] arrest." Id. ¶ 6.

Lastly, the Court indicated that if Porter were able to subpoena persons who were not currently employed by the City, the Court would extend the discovery period until after their depositions. Id. ¶ 7.

Porter said nothing at any of these hearings about discovery on his Monell claim. The original Complaint in the case had included a Monell claim, but Porter had not referred to that claim or advocated any discovery relating to the Monell claim in any of the pretrial proceedings.

Two days later, on October 12, 2017, the Court denied a Motion for Reconsideration filed by Porter that he be allowed to amend the Complaint, which also sought to add three attorneys as defendants. (ECF 42.)

On November 7, 2017, the Court granted in part Porter's Motion for Order to Enforce Outstanding Discovery Orders, and specifically ordered that defense counsel "shall produce any requested City of Philadelphia witnesses [for deposition] between November 13, 2017 and November 22, 2017" and extending fact discovery to December 15, 2017, but noting "No further extensions will be granted." (ECF 48.)

On January 25, 2018, the Court held a final pretrial conference and issued a number of Orders designed to provide for orderly presentation of issues prior to the start of the trial. The jury trial was scheduled to begin with jury selection on March 29, 2018 and the start of testimony on April 2, 2018. (Order ¶ 2, ECF 51).

The parties submitted proposed jury instructions on March 26, 2018. (ECF 72, 74). Porter's proposed jury instructions included instructions on First Amendment, conspiracy, and municipal liability under Monell for violating his First Amendment rights, in addition to numerous standard instructions. (Pl.'s Proposed Jury Instructions at 8-12, ECF 72). Defendants' proposed jury instructions did not include the Monell claim, or proposed conspiracy charge, but included proposed instructions as "First Amendment Rights Are Not Absolute"; "First Amendment – Preservation of the Peace" and "First Amendment – Retaliation Under Section 1983." (Defs.' Proposed Jury Instructions at 5-8, ECF 74).

**B.    Trial Testimony – Summary**

**Witnesses for Plaintiffs in order of their testimony[2]**

**Marilynn Sankowski**

Plaintiff Marilynn Sankowski, Porter's mother, testified about her own injuries in the course of her own case, which were caused by Chew. Her testimony corroborated other plaintiff witnesses' testimony that Chew had come running at Porter soon after he began making the announcement. Porter did not recall Sankowski to the stand.

**Phillip Kemmerer**

Phillip Kemmerer, one of the clerks in the sheriff's department who worked the day of the sale, was an eyewitness to the incident. He testified that he saw Porter start to "read something,"

---

[2] In the course of her case, Sankowski called her doctor, Edward Sing, but his testimony is not relevant to the post-trial motions as to Porter.

whereupon Defendants Chew and Stewart ran toward Porter and motioned to sheriff's deputies, who surrounded Porter within approximately ten seconds and wrestled him to the ground.

**Richard Tyer**

Richard Tyer, also a clerk in the sheriff's department, testified that he worked the day of the sheriff's sale but did not view the events in question because he was looking down at his work. He testified that the sheriff's department had a policy of not allowing announcements at sales, and that if someone made an announcement, he would be told to sit down and if he did not comply, he would be escorted out.

**Alan Nochumson**

Alan Nochumson, attorney for Porter's wife in the foreclosure action, testified to writing the emails to Porter seeking to ensure that the pending declaratory judgment action was announced at the sale, and suggesting to Porter that he make the announcement if the bank's attorney did not attend the sale.

**Marquet Parsons**

Marquet Parsons, who had worked as security at the office of the sheriff's department at the time of the events in question, testified that he had not been present at the sheriff's sale.

**Barbara Deeley**

Barbara Deeley, who had assumed the post of Philadelphia Sheriff on January 1, 2011, testified that she was not present at the sheriff's sale on January 4, 2011 but that the sheriff's department had a policy of prohibiting announcements at sheriff's sales.

**David Porter**

Plaintiff Porter's brother David Porter, who had attended the sale, testified that Porter had informed Chew prior to the sale of his intention to make an announcement. David Porter

testified that when Porter began reading the announcement, Chew ran at Porter within five seconds of Porter beginning to speak, shouting that Porter could not speak. According to David Porter, another man pulled Porter backwards by the jacket and Porter was then surrounded by deputies. David Porter was later recalled as a rebuttal witness to contradict Tricia Sadd's testimony that he had held a video camera, which he denied.

**Michael Riverso**

Michael Riverso, a clerk in the sheriff's department who witnessed the sale, testified that Chew, Stewart, and four or five plainclothes deputies approached Porter within thirty seconds of his beginning to make the announcement. He observed an "altercation," and heard Porter "moaning that [he] couldn't breathe." He also testified that at other sheriff's sales he had attended, individuals making announcements were told to sit down.

**Ed Chew**

Defendant Ed Chew, a lawyer at the sheriff's department, testified that he informed Porter prior to the sale that announcements were not allowed at sheriff's sales. He testified that deputies told Porter to sit down, he did not recall approaching Porter, and that he had thought Porter had completed his announcement when he was told to stop speaking. Chew testified that the deputies attempted to remove Porter from the room. The jury's verdict requires the Court to consider Chew's version of the facts was rejected by the jury.

**Daryll Stewart**

Defendant Daryll Stewart, supervisor of the real estate division at the sheriff's department, testified that he was in charge of the auction on the day of the sheriff's sale. He denied running toward Porter, touching him in any way, or hitting him with a stun gun. He testified that he was

far away from the altercation, and that Porter became "violent." Stewart testified that no signs were posted stating that announcements were forbidden.

**Gerald Harris**

Gerald Harris was an officer with the Philadelphia Police Department who arrested Porter. He testified that he did not observe the incident with the deputies, but described Porter as "compliant" following arrest.

**Debra Porter**

Debra Porter, Plaintiff' Porter's wife, who had been present at the sale, described the $2.8 million mortgage on the property and the emails to Attorney Nochumson. She testified that five or six deputies surrounded the Porters within three seconds of his beginning the announcement, and asked them to leave, which she did immediately after the request. She described the negative effect of the events on January 4, 2011 on her husband.

**James L. Porter**

James L. Porter, Plaintiff Porter's father, who was not present at the sheriff's sale, described the effect of the events on January 4, 2011 on his son.

**James E. Porter**

Plaintiff James E. Porter described the interactions with Nochumson and testified that he had spoken to Chew prior to the sale, and told him that the bank's attorney was supposed to be making an announcement about the declaratory judgment action, which Porter testified Chew said was "fine." Porter testified that when he began reading the announcement, Chew running at him within three seconds. He then felt himself being pulled on the back of the jacket, and saw Stewart pulling him. Porter testified that Chew had grabbed his left arm and was pushing him. Some five to seven deputies surrounded Porter, placed him in a chokehold, and hit him with a

stun gun. While he was in a chokehold, which caused him difficulty breathing, he was handcuffed. He was later jailed, and eventually convicted in state court of resisting arrest.

**Witnesses for Defendants**

**Angellinel Brown**

Angellinel Brown, one of the deputies who subdued Porter, testified that she was alerted to a disturbance at the sheriff's sale. She testified that Porter was "flailing" his arms and described him as combative before he was handcuffed.

**Guerino Busillo**

Guerino Busillo, a sergeant in the sheriff's department, testified that he had spoken to Porter prior to the sale, and that Tricia Sadd had told him that she had been threatened by Porter. Busillo testified that Porter's announcement lasted about a minute, and eventually Chew and Stewart wanted him to stop speaking, so they asked security to ask him to sit down. Busillo testified that he approached Porter and asked him several times to sit down. Thereafter, other deputies approached the scene, and tried to subdue Porter. Busillo testified that Porter tried to hit one of the other deputies, James McCarrie, knocking McCarrie to the ground, and that he himself was hit in the face. Busillo testified that Chew was not near the site of the altercation.

**James McCarrie**

James McCarrie, one of the deputies who subdued Porter, testified that he was backup security on the day of the sheriff's sale, and was called in to respond to Porter. He corroborated Busillo's account, and testified that Porter had struck him in the chest and knocked him to the ground, which resulted in a sprained shoulder.

**William Bengochea**

William Bengochea, another deputy, described observing Busillo repeatedly asking Porter to sit down, and Porter resisting and "flaring his hands up." He testified that McCarrie was struck in the chest and fell down. He testified that Porter was placed in handcuffs while lying on his stomach. Bengochea did not see either Stewart or Chew.

**Tricia Sadd**

The testimony of Tricia Sadd, attorney for the receiver appointed to take care of the property, from Porter's criminal trial was read into the record. Sadd testified that the deputies asked Porter repeatedly to sit down, and that a "tussle" then ensued, although she was not close enough to observe any "blows thrown." She also testified that Plaintiff's brother, David Porter, attempted to make a bid on the property while the altercation ensued and that he had held a video camera.

### C.    Trial – Monell Claim

On Thursday, March 29, 2018, the day of jury selection, the Court held a discussion with counsel and Porter at which Porter asserted that he was not proceeding with his case with respect to all of the Defendants originally named (which included multiple sheriff's deputies), but rather sought to pursue claims only against Defendants Philadelphia Sheriff Barbara Deeley; Ed Chew, counsel for the Sheriff's Department; and Deputy Sheriff Daryll Stewart. (N.T. 3/29/18 12:8-11, ECF 96). The Court found that Porter had not pursued his Monell claim in discovery and stated that it was "going to consider it waived." (Id. 7:15). Porter protested that he had submitted a proposed jury instruction on Monell, and in his pretrial memorandum, he had mentioned Count 2 of his Complaint, in which he had alleged a "policy/custom" of the Philadelphia Sheriff's Department but had not mentioned Monell specifically. (Id. 66-68). Porter's pretrial memorandum did not contain any facts supporting a Monell claim. The Court, which repeatedly mentioned Porter's failure to pursue the Monell claim in discovery and to mention it in the many

pretrial conferences Porter had attended, declined to change its ruling that the trial would proceed as if there was "no Monell claim in this case." (Id. 66:19-24; 68:25).

On the morning of April 2, 2018, Porter docketed an "Emergency Motion for Reconsideration to Include Count II Monell Claim," (ECF 79), a paper copy of which he handed up to the Court at the end of the day's proceedings. Counsel and Porter discussed the reconsideration motion with the Court starting mid-day the following day and after testimony had concluded on Wednesday, April 3, 2018, by which time all of Plaintiffs' witnesses had testified. There was extensive discussion at this point about Porter's desire to proceed on the Monell claim. As noted above, the Complaint had contained a Monell claim, and Porter's pretrial memorandum had repeated the existence of the Monell claim, and Porter had requested a jury instruction on First Amendment Monell liability. However, these documents had contained no factual support for any Monell claim.

During this discussion, the Court noted that Sheriff Barbara Deeley, who had testified by that point, had admitted that the Sheriff's Department had a "policy" of forbidding announcements at Sheriff's sales, and the witnesses had given "uncontradicted evidence" of such a policy, which was apparently not in writing. (N.T. 4/2/18, 224:19-225:9, N.T. 4/3/18, 162:19). In the Court's recollection of the pretrial proceedings, corroborated to some extent by the absence of any discussion of Monell in any of the pretrial orders, Porter had not made any request for discovery, or any assertions about the City's refusal to produce Monell type evidence, as having such a policy. This was a major reason why the Court determined, at the beginning of the trial, that Porter had waived his Monell claim because the Court, as of that date, had not seen any evidence to support it.

Because the Court had only ruled the <u>Monell</u> claim waived a few days before, but had not dismissed the City of Philadelphia from the case, and presumed defense counsel had known of the existence of this policy throughout the litigation, the Court stated that "the prejudice that you've had has really been from Thursday until today." (N.T. 4/3/18, 161:15-16). Summarizing the evidence thus far, the Court opined, "if the jury believes Mr. Porter…I think he has stated … a Monell claim." (<u>Id.</u> 163:4-5). The Court concluded the midday colloquy undecided as to whether to allow the <u>Monell</u> claim, but made clear to defense counsel that they would have wide latitude to "call some witnesses who you may not have thought about calling" and recall witnesses who had already testified. (<u>Id.</u> 164:25-165:1, 169:10).

The Court decided to allow Porter's <u>Monell</u> claim to proceed. (N.T. 4/3/2018 284:5-8). The Court decided to allow a claim against Sheriff Barbara Deeley in her official capacity, which was "basically going to be a Monell claim," and grant a direct verdict against her in her individual capacity. (<u>Id.</u>). Regarding Defendants' assertion of prejudice, the Court stated as follows:

> I reject the Defendant's position that they're gonna be prejudiced. First of all, I can't imagine any discovery that would be half relevant or helpful in this case. The testimony of the Defendants is not clear that this policy is in writing. I have yet to see a document which states this policy, but the witnesses said it was clearly the policy of the Sheriff not to allow announcements, and that's what they told Mr. Porter.

(<u>Id.</u> 284:9-16).

The following day, upon "[f]urther reflection," the Court stated its intention to have the Monell claim proceed against the City—which it again noted was still a party to the case—because it would be "clear and more fair to everybody" to allow the Monell claim to proceed against the city, and the verdict sheet would be with the city as the defendant, on the Monell

claim only." (N.T. 4/4/18 150:24-151:6).[3]  Testimony concluded on April 4, 2018, and a charge conference was held that afternoon prior to closing arguments.  (Id. 161-62).  After the jury returned to hear closing arguments, the Court instructed the jury that its earlier comment that the City was not a defendant was incorrect, and "there [was] a claim against the City of Philadelphia…pending… I just want to make that correction."  (Id. 175:19-23).

### D.    Trial – Verdict and Post-trial Motions

On the morning of Friday, April 5, 2018, the Court instructed the jury and the jury left to deliberate.  (N.T. 4/5/18 8-65, ECF 100).  That afternoon, the jury returned a verdict of $7,963 for Sankowski against Ed Chew.  (ECF 89).  The jury found that Ed Chew, but not Daryll Stewart, had retaliated against Porter for exercise of his First Amendment rights and conspired to deprive Porter of his First Amendment rights; however, the jury decided neither Chew nor Stewart had actually caused harm to Porter.  Nevertheless, the jury awarded Porter $7,500 against Chew.  Finally, the jury awarded Porter $750,000 against the City on Porter's Monell claim for violation of Porter's First Amendment rights.  The jury did not award punitive damages.

Following trial, Defendants moved for judgment as a matter of law, a new trial, or remittitur on May 3, 2018. (ECF 94).  Defendants filed their opening memorandum of law, which raised legal issues relating only to Porter's claims, on June 7, 2018. (ECF 105).  Porter, now represented by counsel, filed a memorandum in opposition on July 20, 2018. (ECF 109).  Defendants filed a reply on August 6, 2018. (ECF 112).

---

[3] See Hafer v. Melo, 502 U.S. 21, 25 (1991)(holding that an official capacity against a supervisor was essentially equivalent to a Monell claim against a governmental entity.)

## IV.    Legal Standard

Defendants move for entry of judgment as a matter of law pursuant to Rule 50, for a new trial pursuant to Rule 59, or in the alternative, for remittitur.  Each of these routes imposes a heavy burden on Defendants.

A post-trial motion for judgment as a matter of law under Rule 50(b) "may be granted 'only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'"  Mancini v. Northampton Cty., 836 F.3d 308, 314 (3d Cir. 2016) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).  Where a jury returns a verdict in favor of the plaintiff, a court must "examine the record in a light most favorable to the plaintiff, giving her the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn."  In re Lemington Home for the Aged, 777 F.3d 620, 626 (3d Cir. 2015) (quoting Dudley v. S. Jersey Metal, Inc., 555 F.2d 96, 101 (3d Cir.1977)).

"[E]ven when judgment as a matter of law is inappropriate," a district court may nevertheless grant a new trial.  Wagner by Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).  Rule 59 allows a court, after conducting a jury trial, to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  However, a court, "should do so only when "the great weight of the evidence cuts against the verdict and ... [ ] a miscarriage of justice would result if the verdict were to stand."  Leonard v. Stemtech Int'l Inc, 834 F.3d 376, 386 (3d Cir. 2016) (quoting Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)) (alterations original).

Finally, remittitur is "a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."  Cortez v. Trans Union, LLC, 617 F.3d 688, 715

(3d Cir. 2010) (quoting <u>Spence v. Bd. of Educ. of Christina Sch. Dist.</u>, 806 F.2d 1198, 1201 (3d Cir.1986)). A court "may not vacate or reduce the award merely because it would have granted a lesser amount of damages." <u>Evans v. Port Auth. of New York & New Jersey</u>, 273 F.3d 346, 352 (3d Cir. 2001).

## V. Summary of Parties' Arguments

### A. First Amendment and First Amendment/<u>Monell</u> Jury Instructions

Defendants assert that the Sheriff's policy of not permitting announcements at auctions did not violate the First Amendment. (Defs.' Mem. in Support of Mot. for Judgment as a Matter of Law ("Defs.' Br.") at 3-5, ECF 105). Defendants, who rely on case law about city council meetings open to the public, appear to use different tests at various points in their brief and assert that not allowing announcements is a proper constitutional policy under the First Amendment because it is not-viewpoint based, is related to the purpose of effectuating the writ in an efficient manner, and there existed ample alternatives in which Porter could have contested the sale of the building. (Id.)

Defendants assert that the Court's jury instructions essentially "usurped" the jury's role and commanded the jury to find for Porter on the First Amendment retaliation claim.[4] (Id. at 7).

Porter responds that the Sheriff's policy violated the First Amendment because the Sherriff's policy was viewpoint-discriminatory—namely, that Chew singled him out to be silenced based on what Chew thought he was going to say about the sale. (Pl.'s Mot. in Opposition to Defs.'s Mot. for Judgment as a Matter of Law ("Porter Br.") at 4, ECF 109). Porter also disputes that ample alternatives existed for him to communicate his message;

---

[4] In their original post-trial motion, Defendants argued that <u>Monell</u> liability was unavailable where no individual defendant was found to have caused harm, <u>see</u> Mot. for Judgment as a Matter of Law (ECF 94), but abandon that argument in their subsequent memorandum.

according to Porter, his purpose in making the announcement was to communicate to a potential buyer that a federal lawsuit regarding the property was ongoing.  (Id.)

Porter says extremely little about the jury instructions, but appears to argue that the Court's instructions were correct.

### B.  The Verdict against Chew: Lack of Causation and Qualified Immunity

In a footnote, Defendants assert that the jury verdict and damages award of $7,500 against Chew on the First Amendment retaliation cannot be allowed to stand for two reasons: Chew was entitled to qualified immunity because the Supreme Court "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause," Reichle v. Howards, 566 U.S. 658, 664–65 (2012).  (Defs.' Br. at 7 n.1).  Defendants also assert that the jury verdict must be vacated on the ground that the jury found that Chew was not the factual cause of harm to Porter.  (Id. at 8.)

Arguing very generally, Porter disputes that Chew was entitled to qualified immunity because the right to speak is a well-known, firmly established right.  Again citing extremely general propositions, Porter asserts that the Court is obliged to reconcile an "inconsistent verdict," and asserts, without citation to case law, that "[a]lthough [the jury] checked a box finding no causation, they unanimously agreed to a damages number. It was the stated intent of the jury to award those damages, and the evidence supported them."  (Porter Br. at 14.)

### C.  Rule 51 Issues

The parties dispute whether the Court erred in not providing counsel a full written copy of the jury instructions prior to the charge.  Defendants complain that the Court inappropriately instructed the jury on physical harm, emotional harm, and loss of past and future earnings to Porter without mentioning those instructions at the charge conference.

### D. Remittitur

The parties dispute whether evidence existed to support jury awards of $750,000 for First Amendment retaliation and civil conspiracy on the basis of the evidence presented. Defendants assert that Plaintiff showed no causal link between the alleged policy prohibiting announcements and the physical, emotional, or economic harm he suffered:

> None of the injuries or medical treatment described were at all related to the alleged Sheriff's Office policy of limiting speech at Sheriff's sales, but instead, as testified to by Plaintiff, occurred as a result of Plaintiff Porter's own intentional and aggressive conduct with Sheriff's deputies. With regards to emotional harm, Plaintiff's evidence was limited to describing the alleged emotional toll that his criminal trial and conviction took upon him…with regards to the alleged loss of past or future wages, there was no testimony at trial that such harm was caused by the Sheriff's Office policy. Plaintiff's evidence referenced his arrest, his criminal trial and his criminal conviction as the cause of his alleged wage loss and inability to obtain a job.

(Defs.' Br. at 15-17.)

Porter responds that the jury heard evidence that he was attacked by the deputies, and an award of damages for physical and emotional harm was appropriate. He also asserts that Defendants should not be entitled to remittitur because the jury award is not so high as to shock the conscience.

## VI.   Discussion

### A.   **<u>Monell</u> claim was properly submitted to the jury**

The parties trade accusations of prejudice based on the reintroduction of the <u>Monell</u> claim partway through trial. Defendants, who never mention the fact that the <u>Monell</u> claim was reintroduced after Porter filed a motion for reconsideration of the Court's ruling that the claim was waived, frame the proceedings as a trial court run amok. Porter responds that he was more seriously prejudiced by the reintroduction practically at the close of his case.

Defendants assert, without any citation to authority, that judgment should be entered for the City on the Monell claim because Defendants were "severely prejudiced" by having been given "mere hours to produce both evidence and a policymaker from the Sheriff's Office in 2011 in order to defend itself" and having been denied "the opportunity to find witnesses or develop documentary evidence from those who were familiar or well versed in the Sheriff's Office policies in effect seven years prior." (Defs.' Br. at 12). The City, again citing no precedent, also seeks a new trial to develop new evidence in defense of its policy.

Defendants seek to frame the trial proceedings as chaotic and prejudicial, but offer a highly selective account of proceedings. Rather than running as amok as Defendants seem to imply, the Court was simply giving Porter's reconsideration motion the consideration it was due.

In this Court's extensive experience in civil rights litigation, Monell claims are often alleged, but seldom proved. Most lawyers who have clients alleging civil rights claims in federal court name the individuals who, under color of state law, are alleged to have violated the plaintiff's rights. Monell claims are often included in the complaint, but plaintiffs have been generally unsuccessful in proving that the City of Philadelphia, particularly regarding the police department, has any policies or customs which violate constitutional rights and thus very few Monell claims against the City of Philadelphia Police Department are successful. The requirements of a Monell claim, as set forth in footnote #1 above, are very demanding. In this Court, there are frequent cases against Philadelphia police officers. The claims against police officers under §1983, for excessive force, etc., stand or fall on particular facts of the case. However, plaintiffs in recent years have been almost uniformly unsuccessful in showing that the City of Philadelphia Police Department has any policies or customs which are violative of constitutional rights or would satisfy the Monell standards. This is in large part due to extensive

policies and training programs which the Philadelphia Police Department has embraced and applied, at least in part, to show adherence to constitutional rights, and avoid liability for damage claims.

Civil rights claims against the Sheriff's Department, as in this case, are much less frequent. However, when the trial testimony in this case revealed, from the Sheriff herself, as well as other witnesses, that the Sheriff's Department had a specific "policy" not to allow any "announcements" to be made at Sheriff's sale – the Court learned, for the first time in this case, that such a policy existed. There is nothing in the record to show that Plaintiff was aware of this policy. Plaintiff certainly never mentioned it at any pretrial conference nor does the Court recall Plaintiff citing it in his pretrial memorandum or in his points for charge.

The admitted existence of a "policy," of course, satisfies a very crucial element of a Monell claim, that is, as noted above, frequently alleged but seldom proved. Here, the Plaintiff did not have to prove it because the Defendant Sheriff admitted it. Thus, the Court felt, in the interest of justice, Plaintiff having alleged a Monell claim in his Complaint, and having referred to it in his pretrial memorandum and in his requests for charge, it would be improper and unfair to Plaintiff, to refuse to allow Plaintiff to proceed on the Monell claim once the Defendant Sheriff at trial admitted, for the first time in the long history of this case, the existence of a policy forbidding announcements at Sheriff's sales.

It is, in this Court's experience, indeed rare for a municipal official to admit the existence of a policy which clearly infringes on constitutional rights, as discussed further in the following section. A Sheriff's sale is not a court proceeding, and is not a governmental hearing.[5] It is

---

[5] The concept of a Sheriff's sale goes back to colonial times, and existed at common law, to provide for orderly disposition of realty in which the debt of owner/debtor had been unable to honor the terms of a loan, where the realty was security for the loan. See George Lee Flint, Jr. &

basically a public auction of real property, carried out by a governmental entity, pursuant to a state statute providing for orderly and public opportunity to acquire properties that have been foreclosed upon for failure to pay outstanding mortgages.

In assessing the right of an individual to speak out at a Sheriff's sale, it falls under the concept of a "limited public forum," as that term has been defined by the Supreme Court and the Third Circuit.

This Court has found no existing precedent approving a total prohibition, i.e., a prior restraint, on an individual who has an interest in a property, however legally doubtful that interest may be, from making any kind of a statement during a Sheriff's sale. There is nothing sacrosanct about a Sheriff's sale that would justify a prior restraint on any kind of statement, particularly by a person with an interest in the property being auctioned. This is not to say that any individual can interrupt a Sheriff's sale to make irrelevant or disruptive comments for any private purpose. However, the facts of this case show no justification for the conduct that took place. The person conducting the sale has no right to forbid an individual with an interest in the property making a short statement as to the individual's interest in the property being offered for sale.

Moreover, the Supreme Court has stated that "[a] document filed *pro se* is 'to be liberally construed.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007). It is unreasonable to expect a pro se litigant such as Porter to submit pleadings and other motions up to the standards of trained counsel. It is not necessarily reasonable for Porter to know the name of the Monell case, or to require him to cite it in his submissions or at pre-trial conferences, and it is likely that, as a non-

---

Marie Juliet Alfaro, Secured Transactions History: The Impact of Southern Staple Agriculture on the First Chattel Mortgage Acts in the Anglo-American World, 30 OHIO N.U. L. REV. 537, 546–48 (2004).

lawyer, Porter did not appreciate the importance of municipal policies to establishing municipal liability under the Monell doctrine.

Porter also rightly points out that, whatever prejudice Defendants may have suffered by the belated reintroduction of the Monell claim, the prejudice to Porter was arguably greater in terms of what evidence he developed: whether or not Defendants had to scramble to put on their case, Porter did not even know what he had to prove to pursue a Monell claim during most of his case in chief.  As Defendants are quick to point out, numerous witnesses had testified by the time the Court even began considering Porter's motion for reconsideration, and no less than thirteen witnesses had testified by the time the Court actually decided to let Porter proceed on a Monell claim.

As the evidence developed, it became clear to this Court that reconsideration was appropriate—as the Court mentioned repeatedly, the uncontroverted evidence was clear that the Sheriff's Department had a policy of forbidding announcements at sales.  The Third Circuit has long held that "[t]he purpose of a motion for reconsideration…is to correct manifest errors of law or fact or to present newly discovered evidence."  Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).  Both of these happened in this case.  Although the Court had not been aware that Porter had any facts to pursue his Monell claim, the Court realized that Porter had indeed included a mention of the Monell claim in his pre-trial memo and submitted a Monell charge in his proposed jury instructions—and the evidence belatedly revealed that a policy of forbidding announcements existed.  Thus, the grant of reconsideration was appropriate.

In addition, it was clear to this Court that there was no real prejudice to Defendants from the Court's reversing its prior erroneous ruling and allowing the Monell claim to proceed:

Defendants had been on notice since the very beginning of the case that Porter sought to proceed on a <u>Monell</u> claim. Defendants never stated, during discovery, that there was a policy prohibiting announcements. Defense counsel presumably knew of the policy, and knew that they were defending a <u>Monell</u> claim, at least until the Court's erroneous ruling on March 29, 2018. Thus, as the Court stated, "the prejudice that you've had has really been from Thursday until today." (N.T. 4/3/18 161:15-16). And as discussed further below, the Court issued a curative instruction and leave to call additional witnesses.

The Court's reversal of its erroneous ruling and reintroduction of the <u>Monell</u> claim was well within its discretion, and promoted an interest in allowing the jury to consider a legitimate fair trial policy of giving the jury the opportunity to consider the Defendants' outrageous conduct, in the context of the appropriate constitutional claim, in the event the jury believed that Porter as to what had taken place. As a general matter, district courts have "wide discretion in the management of their cases." <u>United States v. Wecht</u>, 484 F.3d 194, 217 (3d Cir. 2007), as amended (July 2, 2007). <u>See also</u> <u>Yakowicz v. Com. of Pa.</u>, 683 F.2d 778, 784 (3d Cir. 1982) (district courts possess "broad powers" in the management of cases "as they proceed through the various stages before and during trial").

The delay that Defendants deem so prejudicial stemmed from giving Porter's reconsideration motion the consideration it was due. When ruling, the Court made clear to Defendants that they could recall witnesses or "call some witnesses who you may not have thought about calling," but Porter did not have that opportunity. (<u>Id.</u> 164:25-165:1, 169:10). In their post-trial submission, Defendants lament their lack of opportunity to develop evidence relating to their rationales for the policy, such as distinguishing bankruptcy proceedings—a subject on which there was actually some testimony. <u>See Id.</u> 89:3-8. However, in light of the

Court's curative instruction, any failure by Defendants to develop such evidence (or develop it further) was their tactical decision.  Porter did not even have that choice.  Accordingly, the Court's decision to grant reconsideration while allowing Defendants to revise their case does not warrant a new trial, much less judgment as a matter of law.

### B.  First Amendment

#### 1.  The evidence was sufficient to sustain the verdicts

The evidence introduced at trial was sufficient to sustain the jury verdicts both as to Chew for violating Porter's First Amendment rights and as to the City under a <u>Monell</u> theory.

##### a.  First Amendment Principles

The Third Circuit has stated that "[t]hree considerations underlie any First Amendment analysis of a challenge that plaintiffs were excluded from an event: (1) whether the speech is protected by the First Amendment; (2) the nature of the forum; and (3) whether the government's justifications for exclusion from the relevant forum satisfy the requisite standard." <u>Startzell v. City of Philadelphia, Pennsylvania</u>, 533 F.3d 183, 192 (3d Cir. 2008) (internal quotation marks omitted).[6]

Porter's speech was protected by the First Amendment.  The Third Circuit has stated that "except for certain narrow categories deemed unworthy of full First Amendment protection–such as obscenity,  'fighting words'  and  libel–all speech is protected by  the  First  Amendment." <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 282–83, 283 (3d Cir. 2004).

---

[6] In a recent opinion, the Third Circuit held that "'First Amendment retaliation claims are always individually actionable, even when relatively minor' and that the deterrence threshold to chill a plaintiff from exercising her First Amendment rights by reason of the defendant's conduct for such a claim is 'very low.'" <u>Conard v. Pennsylvania State Police</u>, ___ F. 3d ___ (3d Cir. 2018) (citing <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 127-28 (3d Cir. 2006)).

The classification of the forum in which relevant speech occurs "determines the contours of the First Amendment rights that a court recognizes when reviewing the challenged governmental action."  Galena v. Leone, 638 F.3d 186, 197 (3d Cir. 2011) (city council meeting qualified as a "limited public forum").  The Third Circuit has described the various types of fora as existing on a "spectrum" ranging from a "traditional public forum," which receives the greatest protection under the First Amendment, to a "limited public" or "nonpublic forum," which receive the least.  Nat'l Ass'n for Advancement of Colored People v. City of Philadelphia, 834 F.3d 435, 441 (3d Cir. 2016) (holding that the burden of justifying a speech restriction in a limited public or nonpublic forum was on placed on the government).  In this case, the parties evidently agree that the sheriff's sale was a limited public forum, which is a forum provided by the government "that is limited to use by certain groups or dedicated solely to the discussion of certain subjects."  Galena, 638 F.3d at 198.  (See Porter Br. at 3; Defs.' Br. at 3).

In a limited public forum, "to avoid infringing on First Amendment rights, the governmental regulation of speech only need be viewpoint-neutral and 'reasonable in light of the purpose served by the forum.'"  Galena, 638 F.3d at 198.  Galena continued:

> [t]he reasonableness of a time, place or manner restriction on speech presents a question of law but the determination involves three subsidiary elements: the challenged restriction must be (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leave open ample alternatives for communication of information.  The three subsidiary elements of the reasonableness question pursuant to which a court determines the validity of the restriction are questions of fact which should be submitted to the jury, except where the evidence applicable to a particular element entitles a party to judgment as a matter of law on that element.

638 F.3d at 202–03 (citation omitted) (emphasis added).  Galena also stressed that "even if a limitation on speech is a reasonable time, place, and manner restriction, there is a First

Amendment violation if the defendant applied the restriction because of the speaker's viewpoint." Id. at 199.

### b. Case law

Galena concerned a city council meeting, which as part of its agenda had time reserved for public comment. When the plaintiff attempted to address the council outside of that time, he was escorted out. Id. at 193. Applying the principles described above, the Third Circuit found that the city council meeting was a limited public forum, but no First Amendment violation had occurred. Id. at 203. The Third Circuit held that, on the record before it, "adequate alternative means" had existed for the plaintiff to communicate his message. Id.

Similarly, Eichenlaub v. Township of Indiana, 385 F.3d 274 (3d Cir. 2004) also concerned a city council meeting, and likewise held that "[a]ny restrictions on speech must be viewpoint neutral and must be reasonable in light of the purpose served by the forum." Id. at 280. In that case, a citizen was ejected when he engaged in "badgering, constant interruptions, and disregard for the rules of decorum" in attempting to speak on private matters. Id. at 281. The Third Circuit found the ejection not to be viewpoint-discriminatory where the plaintiff's silencing "served the function of confining the discussion to the purpose of the meeting." Id. at 281.

The parties dispute the significance of Kuerbitz v. Meisner, No. 16-12736, 2017 WL 4161111 (E.D. Mich. Sept. 20, 2017), aff'd on other grounds, No. 17-2284 (6th Cir. July 11, 2018), in which a Michigan man had sought to enter a public foreclosure sale of his property to object to the sale of his former property and conduct a citizen's arrest of officials conducting the sale, but was barred from doing so. On the defendants' motion to dismiss, the district court found that the plaintiff's "intention to enter the foreclosure sale to express his objection to the sale of

his former property" was "clearly a form of protected speech." Id at *6. Because the complaint did not allege that "the auction occurred at a place that by long tradition or by government declaration had been devoted to assembly and debate, or a place that the government 'opened up' for such a purpose," the Court found that the plaintiff's allegations, "at most, support[ed] a reasonable inference that the auction took place at limited public forum." Id. at *8. Ultimately, because the plaintiff had been barred from the foreclosure sale to prevent him from conducting the citizen's arrest and engaging in disruptive conduct, not to prohibit him from protesting the sale, the court ruled that his exclusion from the venue was content-neutral, the exclusion was constitutional, and that he had not stated a First Amendment claim. Id. at *9.

Courts have also frequently found First Amendment violations where a plaintiff was stopped from speaking within the confines of an open meeting or public comment period. For example, in Zapach v. Dismuke, 134 F. Supp. 2d 682 (E.D. Pa. 2001), this Court held that a the plaintiff's First Amendment rights were violated when the plaintiff sought to read a one-page statement at a zoning hearing board meeting, and the defendant, who was chair of the zoning board, requested that the plaintiff not mention the names of certain township supervisors, whereupon the defendant asked the plaintiff to sit down. Id. at 686. The defendant then got up, "approached Plaintiff, put his hand on Plaintiff's arm, tried to grab the paper on which the speech was printed from Plaintiff's hand, and guided him away from the microphone as Plaintiff attempted to continue to read his prepared text." Id. This Court found that this amounted to a First Amendment violation, but granted summary judgment to the defendant had both qualified immunity and absolute quasi-judicial immunity.

Similarly, another district court, following a jury trial finding a First Amendment violation, denied the post-trial motion for judgment as a matter of law or a new trial as to a

defendant city councilman who had banged his gavel three times to stop the plaintiff from reading his prepared remarks, which accused the city council chair of bias against Italian-Americans, and a defendant city council chair who had told the plaintiff to stop speaking. Anello v. Anderson, 191 F. Supp. 3d 262 (W.D.N.Y. 2016). The plaintiff, who continued speaking despite the gaveling, was repeatedly asked by a police officer to stop speaking, and when the plaintiff protested that he "had the floor," he was forcibly escorted out in handcuffs, and later charged with resisting arrest and disorderly conduct. Id. at 271. After the jury found for the plaintiff on his First Amendment claims, the court granted the post-trial motion for judgment as a matter of law as to a defendant who had stopped the microphone from recording—which had not affected the sound amplification or the plaintiff's ability to speak—but the court denied the motions as to the council member who had gaveled the plaintiff down and the city council chair who had told the plaintiff to stop speaking. Id. at 275. The court found sufficient evidence to support the jury's verdict of a First Amendment violation. The court further denied qualified immunity as to these two defendants. Id. at 275-77.

### c. Monell

As discussed above, under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978), "[l]ocal governing bodies…can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where…the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." In the Third Circuit, plaintiffs must "demonstrate a plausible nexus or affirmative link between" the policy and "the specific deprivation of constitutional rights at issue." Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). This is exactly what the Court instructed the jury. (See N.T. 4/5/18 31:6-10). See also Kneipp v.

Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996) (reversing grant of summary judgment to defendant under same standard). Thus, to establish liability against the City, Porter needed to establish the existence of a policy or custom, as well as the requisite plausible nexus or affirmative link.

### d. The evidence was sufficient to support a jury verdict

Porter's evidence established that, although he was attempting to read only a three-sentence announcement, he was stopped within three and thirty seconds of his beginning to speak. This was apparently at the request of Chew, who signaled to the deputies to stop Porter from speaking—and not only silenced Porter, but tackled him, put him in a chokehold, and dragged him out of the venue. Porter testified that he was physically pulled, thrown to the ground, hit, choked, could not breathe, and was hit with a stun gun. (N.T. 4/3/18, 231:15-233:23.) Porter's brother, David, testified to hearing Porter saying that he could not breathe and seeing Porter being "kneed in the temple." (Id. 20:13; 48:3-5). Porter testified that he found the altercation "embarrass[ing]" and "humiliat[ing]." (Id. 244:18-22). Porter marshalled a large number of witnesses, who corroborated this account. Numerous witnesses for both Porter and Defendants confirmed the existence of a policy ostensibly forbidding announcements at sheriff's sales.

Under the relevant First Amendment standards for limited public fora, this evidence was sufficient to support a verdict against both Chew and the City.

As a threshold matter, there was no evidence that ample alternatives for Porter to communicate his message existed—in contrast to Galena, where the city council meeting included time for public comment. Defendants construe Porter's announcement regarding the pending litigation as simply yet another attempt to stop the sale, and list the many possibilities of which he availed himself in order to do so. (Id. at 5-6). However, as Porter argues, that was not

his message: he was trying to warn potential buyer that that buyer would be purchasing the property subject to litigation. There was no other forum for Porter to communicate that information. (Porter Br. at 5). Thus, the "ample alternatives for communication of information" required by Galena and other cases regarding limited public fora simply did not exist.

There was also testimony that the organizers of the sheriff's sale tolerated announcements, suggesting that Chew's implementation of the policy was viewpoint-discriminatory. Phillip Kemmerer, a clerk in the real estate office at the sheriff's office who had worked in the sheriff's office on the day of the sale, that, since the date of Porter's incident he had seen people make announcements at sheriff's sales, and "nothing" had happened in response to "most" announcements, although protesters would be escorted out. (N.T. 4/2/18, 149:3-11, ECF 97.) Defendant Chew testified as follows:

> Mr. Porter had told me that he wanted to make an announcement, and he told me what the announcement was, and I told him two things; number one, we don't allow announcements like that, and number two, I also told him, again, that this is not the end of the world as far as his property is concerned, that whatever you wanna say to the public now, can be raised later on and perhaps the sale is overturned.

(N.T. 4/3/18, 75:10-16.) Chew also explained, regarding the announcement, "It depends on what he wanted to say, and the reason why I'm concerned, and I've always been concerned about people making an announcement is, at the sale is, because sometimes the announcement have a chilling effect on the sale itself." (Id. 84:9-12) (emphasis added). Chew thus essentially conceded that the policy, or at least his application of it, was not content-neutral, and discriminated on the basis of Plaintiff's viewpoint, which does not satisfy the requirements for a limited public forum under Eichenlaub. Moreover, if the sheriff's employees interrupted Porter very soon after beginning his brief announcement, as the jury apparently found, they would

necessarily have found that he was silenced because of what the sheriff's deputies thought he was going to say.

In their brief, Defendants argue that the policy forbidding announcements "serves the important governmental purpose … of insuring that those who hold valid judgments against property owners can collect their judgments" but make no attempt whatsoever to argue that the policy was narrowly tailored to that interest, which is a requirement for time, place, and manner restrictions to be valid under <u>Galena</u>.  (<u>See</u> Defs.' Br. at 5).

The Third Circuit's cases regarding limited public fora require all of criteria to be met for a time, place, and manner restriction to be deemed acceptable under the First Amendment. <u>Galena</u> nevertheless allowed a judge, at trial, upon hearing the evidence and finding one or more of the elements of the reasonableness of a time, place, and manner restriction on speech in a limited public forum, to decide that that element was not met.  <u>See</u> 638 F.3d at 203.  It was clear that, if Porter's evidence was to be believed, the sheriff's department, both in its overbroad policy and its viewpoint-discriminatory implementation, violated Porter's First Amendment rights in silencing his brief announcement.

Although Porter's witnesses and Defendants' differed sharply on the events of January 4, 2011—with Defendants' witnesses asserting that Porter had been politely asked to sit down before an ensuing scuffle and Porter's witnesses describing swift and violent reprisal by the deputies, at Chew's behest—the evidence was uncontroverted that he was silenced for attempting, however briefly, to speak.  An attack on Porter intended to silence him would have violated Porter's First Amendment rights, and the jury apparently believed Porter's account.

There was also sufficient evidence to support a jury verdict against the City under <u>Monell</u>.  The evidence Porter presented showed the requisite "plausible nexus or affirmative

link" between the policy of the Sheriff's Department prohibiting announcements—whose existence Defendants do not contest—and the harm he suffered. The affirmative link between the policy and its brutal implementation through physical force is obvious: the jury apparently believed that the policy was enforced through physical force applied in immediate retaliation for Porter's exercise of his First Amendment rights. Pursuant to the policy forbidding announcements, Chew apparently asked for such a response.

Furthermore, the harm suffered by Porter in the form of physical injuries—which, as he testified, required medical treatment—and emotional harm were sufficient to support an award of compensatory damages. With respect to damages, the Court gave relatively standard instructions on "physical harm to plaintiffs during and after the events at issue," "emotional and mental harm to the plaintiffs during and after the events at issue" and "loss of past and future earnings" as to Porter. (N.T. 4/5/18, 35:6-20).

In an attempt to vacate the damage award, Defendants cite portions of testimony with a much more attenuated link to the Sheriff's unconstitutional policy, or the deputies' apparently violent enforcement of it, such as his testimony regarding the difficulty of finding a job due to outstanding criminal charges, or going on food stamps as a result. (See Defs.' Br. at 17). However, Porter's and other witnesses' testimony regarding the more immediate effects of the implementation of the policy, which caused him physical injury and humiliation, are more than sufficient to support a jury verdict and an award of damages.

### 2. Remittitur is not warranted

Defendants awarded Porter $750,000 in damages against the City and $7,500 against Chew. Defendants, who again cite no case law in support of their position, consider this award inappropriate because whatever types of harm Porter may have experienced were not "causally

connected" to the Sheriff's office policy of prohibiting speech at Sheriff's sales. Porter again asks that the verdict be allowed to stand.

The Third Circuit has explained that courts reduce damages awards in one of two circumstances, which are often colloquially referred to as "remittitur": when a court reduces an award to satisfy constitutional due process concerns as unconstitutionally excessive or legally unsupported, and when it considers an award unreasonable on the facts of the case at hand. Cortez v. Trans Union, LLC, 617 F.3d 688, 715-16 (3d Cir. 2010) (affirming award of compensatory damages in Fair Credit Reporting Act case). A jury's award of compensatory damages "will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award." Id. at 718. An award of compensatory damages will be upheld unless it is "so grossly excessive as to shock the judicial conscience." Id. In this "exceedingly narrow" review, the Court views the facts in the light most favorable to Porter, the non-movant. Id.

Neither a constitutional nor a discretionary reduction is warranted on the facts of this case. As noted above, a damage award is not against the weight of the evidence, and is supported by Porter's testimony regarding physical and emotional harm. This Court cannot say that an award of $750,000 is grossly excessive or shock the judicial consciences—much less violates the City's due process rights. Furthermore, the Court declines to order a discretionary remittitur because the award is not unreasonable on these facts.

What cases Defendants cite are limited to the issue of emotional distress damages—and are all distinguishable. Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 205 (3d Cir. 1996) affirmed the district court's remittitur of emotional distress damages but reinstated the jury's award of front pay in a case tried under New Jersey employment discrimination law; the passage

quoted by Defendants actually refers to the reluctance of New Jersey courts to award emotional distress damages when considering their state anti-discrimination law.   Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108 (3d Cir. 1988) was also an employment discrimination case, and held that insufficient evidence of emotional distress supported an award of damages where a black plaintiff who had been passed over for a promotion testified that he "had been done wrong"; "had been treated unfairly"; planned "to contest [the successful applicant's] qualifications"; and was described by another witness as "very upset." Id. at 1120.   Gunby went on to distinguish other cases in which courts had allowed awards of emotional distress damages where, as in this case, there was "direct and substantial evidence of humiliation or emotional injury." Id. at 1121. Finally, Spence v. Bd. of Educ. of Christina Sch. Dist., 806 F.2d 1198 (3d Cir. 1986), was a First Amendment retaliation case in which a jury found that the plaintiff art teacher was transferred from her job at a high school to another elementary school.   The Third Circuit affirmed the district court's grant of remittitur where the only evidence of emotional distress was "plaintiff's own testimony that she was depressed and humiliated by the transfer and that she had lost her motive to be creative." Id. at 1201 (finding this evidence too "speculative" to support jury award).   As discussed above, the record is much more robust here, and is not limited to emotional distress damages alone.

### 3.  Jury Instructions

In its charge to the jury, the Court instructed the jury at length on the First Amendment, including the concept of a limited public forum.   Much of the Court's charge was taken, verbatim, from the lead cases cited above.   The Court instructed the jury as follows:

> A limited public forum is created when the government opens a space not traditionally used for speech but limits the expressive activity to certain kinds of speakers or to the discussion of certain kinds of subjects.

In a limited public forum, content-based restraints are permitted so long as they are to designed to confine the forum to the limited and legitimate purposes for which it was created. The government may not regulate speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

In a limited public forum, the government, however, may restrict the time, place, and manner of speech as long as those restrictions are reasonable and serve the purpose for which the government created the limited public forum. A time, place and manner restriction on speech is reasonable if it is: first, content neutral; second, narrowly tailored to serve an important governmental interest; and, three, opens – leaves open ample alternatives for communication of information. However, even if a limitation on speak is reasonable time, place and manner -- is a reasonable time, place and manner restriction, there may be a First-Amendment violation if the defendant applied the restriction because of the speaker's viewpoint.

(N.T. 4/5/18, 21:12-22:9.)

Defendants take issue with the following jury instructions:

I instruct you that Mrs. Sankowski and Mr. Porter had a constitutionally-protected right to speak at the sheriff's sale in order to make the announcement that had been discussed with their attorney. In other words, no person employed by the sheriff's office, whether a law enforcement officer or not, had any right to interfere with their making such an announcement.

You have heard testimony that the sheriff's office had a policy against announcements. <u>I instruction [sic] you that this policy, as applied to the plaintiffs at the hearing, was in violation of their constitutional right to freedom of speech and to petition</u>. Plaintiff's attempt to speak was in furtherance of their constitutional right to speak and to petition.

(<u>Id.</u> 22:20-23:7) (emphasis added).

After additional colloquy with the attorneys, the Court added the caveat that if the jury were to find that Porter was seized "very prompt[ly] after he started to speak," it could "find that his interruption was in retaliation for his trying to exercise his First Amendment rights." (<u>Id.</u> 60:6-8). The Court stressed that the jury should find for Porter only if it believed his account, but if they found that Porter has "failed to prove that Mr. Chew and Mr. Stewart did any act that was in retaliation for [Porter's] getting up to speak, exercise his First-Amendment right, then you

should find for the defendants." (Id. 60:16-19). This is in no way a directed verdict for Porter, as Defendants appear to imply.

Defendants rely principally on Galena to argue that the Court "usurped" the jury's role in determining whether the First Amendment was violated. However, Galena left open the possibility that the criteria for reasonableness of a time, place, and manner restriction in a limited public forum might not be a jury issue "where the evidence applicable to a particular element entitles a party to judgment as a matter of law on that element." 638 F.3d at 203. Galena also held that "even if a limitation on speech is a reasonable time, place, and manner restriction, there is a First Amendment violation if the defendant applied the restriction because of the speaker's viewpoint." Id. at 199.[7] Porter's evidence was remarkably consistent and, if accepted, established a total lack of alternative means of communication through the policy forbidding announcements and a potentially viewpoint-discriminatory implementation by Chew and the deputies.

Defendants' vigorous post-trial objections to the jury instructions ring somewhat hollow given the poor quality of their proposed jury instructions they submitted to the Court, which were unhelpful, unfocused, incomplete and, in many cases, entirely erroneous. For example, Defendants' proposed instruction on First Amendment retaliation stated, "To constitute protected speech, the speech must relate to matters of public concern." (Defs.' Proposed Jury Instructions at 8). This is a completely inaccurate statement of the law, as the Third Circuit has stated—in a

---

[7] This case is analogous to a Court properly instructing a jury in an automobile accident that if the jury believes that the defendant violated a motor vehicle code, negligence was established. See Mihalic v. Texaco, Inc., 377 F.2d 978, 981 (3d Cir. 1967); see also Thompson v. Austin, 272 F. App'x 188, 192-93 (3d Cir. 2008). In Thompson, the Third Circuit found error in the District Court's failure to give a negligence per se instruction to the jury in a car accident case, holding that "[w]hile the jury was free to find that Austin did not violate the motor vehicle code, it was required to find he was negligent *per se* if it found that he did violate the code." Id.

case on which Defendants now rely—that "except for certain narrow categories deemed unworthy of full First Amendment protection–such as obscenity, 'fighting words' and libel–all speech is protected by the First Amendment," protection which "includes private expression not related to matters of public concern." Eichenlaub v, 385 F.3d at 282–83, 283. Defendants proposed a charge to the effect that "[r]egulations designed to preserve the peace and to maintain public safety do not violate the First Amendment guarantees of free speech, press and the exercise of religion," a statement suggesting that any regulation of speech intended to preserve public order is necessarily immune from constitutional attack. (Defs.' Proposed Jury Instructions at 7). Moreover, Defendants' proposed jury instructions did not address what type of forum the sheriff's sale was—an issue also inadequately explored in their briefs—and what types of restrictions on speech would therefore be permissible. Defendants did not request instructions on whether the restrictions on speech were content-neutral, narrowly tailored, or left open ample alternatives for communication. Defendants thus did not even seek to ask for the jury's findings on questions that they now complain should have been left to the jury—and, in so doing, caused the Court to expend much time and effort during trial on legal research that counsel evidently did not do.

Thus, the Court properly instructed the jury that if it accepted Porter's account of events, the sheriff's policy of prohibiting announcements was unconstitutional because if the jury made such a finding, it would necessarily have found that the policy did not meet the criteria under Galena, Eichenlaub, and other cases.

### 4. Defendants' exceptions to the jury charge did not require altering the instructions

Rule 51(c)(1) requires a party who is objecting to a jury instruction to "do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). Under Rule 51(d)(1), a party must "properly object[]" in order to preserve a claim of error in jury instructions; otherwise, courts "review for 'plain error in the instructions affecting substantial rights.'" <u>Franklin Prescriptions, Inc. v. New York Times Co.</u>, 424 F.3d 336, 339 (3d Cir. 2005) (quoting Fed. R. Civ. P. 51(d)(2)). Objections to jury instructions "must be both cogent and specific to the alleged error." <u>Lesende v. Borrero</u>, 752 F.3d 324, 335 (3d Cir. 2014). Thus, where an objection was "difficult to understand because of its convoluted grammar" and "did not specify the authority upon which it was based," the Third Circuit has found objections to jury instructions not to have been properly preserved, as in <u>Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.</u>, 89 F.3d 976, 993 (3d Cir. 1996).

Such was the case here. Defendants attempted to object on several occasions, in vague terms, to assert that whether the sheriff's policy was unconstitutional was a question for the jury. At the charge conference, defense counsel stated:

> MS. ZABEL: [T]he jury has to decide whether they think it's unconstitutional. I mean, that's the problem we're at right now. They have to decide whether the policy is, first, gets the first amendment retaliation, whether it's time, place, manner, whether it's viewpoint, neutral –
> THE COURT: All right. So you don't think I should instruct them that it would be a violation?
> MS. ZABEL: No, Your Honor. I don't –
> THE COURT: All right. Let me, I will think about that.
> MS. ZABEL: Okay.
> THE COURT: You may be right about that.

(N.T. 4/4/18 171:23-172:10, ECF 99).

Defendants raised the issue of wanting the issue of whether the policy was a reasonable restriction on speech again during a discussion of the verdict form:

> MS. ZABEL: But, Your Honor, if that's -- this is something we talked about before, that, when it became a limited public forum –
> THE COURT: Yeah.
> MS. ZABEL: -- then the jury has to decide whether time, place, manner, reason –
> THE COURT: Well, I'm going to give a charge on that. I'm going to charge on that what I think is correct.
> MS. ZABEL: Well, when you charge on it, that's when they're deciding whether the speech is protected, if they think the restriction's reasonable at the time they –
> THE COURT: I'm -- in my view, if they accept his version of the facts, I'm instructing them that the speech was protected. That's a –
> MS. ZABEL: Will the jury charge say it's in dispute or no?
> THE COURT: Well, you'll listen to the charge. Okay?
> MS. ZABEL: Okay.
> THE COURT: I'm not going to change this. All right. You all -- you all have an exception.

(N.T. 4/5/18, 5:22-6:2, ECF 100.)

The most detailed discussion, which took place after the initial charge, was as follows:

> THE COURT: I said that this policy, as applied to the plaintiffs at the hearing, was in violation of their constitutional right to speak and to hear. Okay? …
> MS. ZABEL: That's what I object to, because it's the jury's function to decide whether the policy was unconstitutional –
> THE COURT: Okay.
> MS. ZABEL: -- and whether it was the moving -- you know, it's their -- it's their –
> THE COURT: Well, I said, "as applied to the plaintiffs."
> MS. ZABEL: "As applied to the plaintiffs." I mean, that's –
> THE COURT: Well, that –
> MS. ZABEL: That's what the jury has to do, decide if, as applied to the plaintiffs, this violation –
> THE COURT: Okay. I –
> MS. ZABEL: -- or this policy was wrong.
> THE COURT: All right. You have an exception as to that.
> MS. ZABEL: Okay.
> THE COURT: But I also said at another point, though, that, if the jury finds that the plaintiffs have failed to prove by preponderance of the evidence their claims, then they should -- then they must return a verdict for the defendants.

MS. ZABEL: I understand that but the fact that you're telling them that the -- that is a violation, I mean –

THE COURT: As applied to the plaintiff. It's my holding that -- well, let me put it this way: There are wide variations in the testimony about what happened. Okay? But I think the plaintiffs are entitled to an instruction that the Sheriff's Office -- no one from the Sheriff's -- neither Mr. Chew or Mr. Stewart had a right to prevent Mr. Porter from speaking. But they denied it. So they asserted -- they testified they didn't touch him and that's important. If the jury finds that the plaintiffs have failed to prove their facts, then the defendants are entitled to a verdict. And I think I said that very clearly. But I –

MS. ZABEL: It was, Your Honor.

THE COURT: The plaintiff -- you know, we have to put this in context. I have to -- I have to charge the jury as to the legal significance of the plaintiffs' claims. So the plaintiffs' claims -- Mr. Porter claimed and there were other witnesses who supported him but not every witness -- but there was some testimony that, very shortly after he got up to speak -- somewhere between 3 and 30 seconds depending on different testimony -- he was interfered with. And I think I have a duty to tell the jury that, if they accept that testimony, that was in violation of the First Amendment. I think -- that's -- that is not for the jury. If they accept Mr. Porter's testimony, I think -- now, if you want me to elucidate that a little more, in more detail, I'll consider doing that. Is that what you're saying? And I'll make it clear that, if they believe that he was interrupted very quickly, then I'm telling them, as a matter of law, that was a violation. But, if they find that, from other testimony, that he got to give his speech and then he refused to sit down, then they may find for the defendants.

MS. ZABEL: Yes, Your Honor. We would ask that you just draw that out a little bit.

(N.T. 4/5/18, 43:22-46:9, ECF 100.)

Defense counsel's objections were consistently vague and garbled, and counsel never cited any authority for its position that the issue of "whether the policy was unconstitutional" was for the jury, and never broke down its argument on any of the issues. In addition, the Court, towards the end of the colloquy, asked for clarification of what counsel was actually arguing. This is not the sort of "cogent and specific" objection that the Third Circuit has required.

No exception that Defendants lodged gave this Court any reason to change its instructions to the jury, particularly where counsel was unable to cite applicable case law to the Court.

### C.  The Verdict against Chew: Qualified Immunity and Causation

#### 1.  Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  See also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (stating that "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct").  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Qualified immunity is therefore a "two-pronged inquiry" in which courts must inquire whether a government official's conduct violated a right belonging to the plaintiff and whether that right was "'clearly established at the time of the violation."  Tolan v. Cotton, 134 S. Ct. 1861, 1865, 1866 (2014).

The Supreme Court has further warned courts "not to define clearly established law at a high level of generality"; rather, the dispositive question is whether the violative nature of *particular* conduct is clearly established," an inquiry that should not be made "as a broad general proposition."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).  When determining whether a right was clearly established, courts should "look first for applicable Supreme Court precedent," but if no such precedent exists, it may nonetheless "be possible that a 'robust consensus of cases of persuasive authority' in the Court of Appeals could clearly establish a right

for purposes of qualified immunity." Mammaro v. New Jersey Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir.), as amended (Mar. 21, 2016).

Plaintiff argues in such broad general propositions in asserting that "[f]ew rights are better known than the right of free speech, and any reasonable person would have known that Porter had that right." (Pl.'s Br. at 6). For their part, Defendants blur the boundaries of what the Court identified as separate issues—namely, Chew's and the deputies' silencing Porter and, subsequently, Porter's arrest—when Defendants argue, relying on Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012), that the Supreme Court "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause."

The Court found at trial and continues to find that Porter's First Amendment rights were violated. But because qualified immunity is a two-pronged inquiry, the Court's analysis does not end there—it remains to be determined whether the right was clearly established at the time of the events in question. Thus, the proper inquiry in this case is whether, on January 4, 2011, it was clearly established law that Chew violated Porter's First Amendment rights by interrupting his announcement at a sheriff's sale, and whether Porter therefore had a right to be free from retaliation for exercise of his First Amendment rights at the sheriff's sale.

The Supreme Court first articulated the concept of a "limited public forum" in Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45–46 (1983)("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.") In Monteiro v. City of Elizabeth, 436 F.3d 397, 400 (3d Cir. 2006), a member of the Elizabeth, New Jersey City Council was ejected from an annual budget council meeting by the council president after speaking against the proposed budget. The District Court denied the council president's motion for summary

judgment, finding that "whether she was entitled to qualified immunity depended on the disputed question of her motivation for ejecting Monteiro from the meeting." <u>Id</u>. at 402. The Third Circuit affirmed, finding that "[i]t is clearly established that when a public official excludes a[n] elected representative or a citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment." <u>Id</u>. at 404. As in <u>Monteiro</u>, Porter's First Amendment rights were clearly established. Accordingly, Chew is not entitled to qualified immunity.

### 2. Causation

The award of damages must be vacated on the alternative ground that in the section of the jury form entitled "Causation," the jury marked that Chew did not actually cause harm to Porter. The Supreme Court has stated that "the basic purpose of § 1983 damages is to *compensate persons for injuries* that are caused by the deprivation of constitutional rights." <u>Memphis Cmty. Sch. Dist. v. Stachura</u>, 477 U.S. 299, 307 (1986) (emphasis original) (citation omitted). Compensatory damages under 42 U.S.C. § 1983 "are governed by general tort-law compensation theory." <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 250 (3d Cir. 2000) (citing <u>Carey v. Piphus</u>, 435 U.S. 247, 255 (1978)). Thus, "damages are available under [§ 1983] for actions found ... to have been violative of ... constitutional rights and to have caused compensable injury." <u>Allah</u>, 226 F.3d at 250 (quoting <u>Carey</u>, 435 U.S. at 255) (ellipses and alteration original). Without Chew's having caused the constitutional violation, he cannot be made to compensate Porter for the violation of Porter's rights under the First Amendment. We will grant judgment as a matter of law in favor of Chew on this point.

### D. Rule 51

Defendants further argue that a new trial is warranted based on the Court's purported violations of Rule 51(b)(2); Defendants argue that they were "further prejudiced by the fact that

the jury instructions were never made available to defense counsel prior to final jury arguments." (Defs.' Br. at 13.) In particular, Defendants assert that they were prejudiced by the fact that they did not know how the Court would instruct the jury on damages, especially with respect to what types of harm Porter could recover. Porter, citing case law interpreting a former version of Rule 51, argues that this Court complied with the terms of the Rule. (Pl.'s Br. at 9 (citing Taylor v. Allis-Chalmers Mfg. Co., 320 F. Supp. 1381 (E.D. Pa. 1969)).

Rule 51(b) requires courts to "inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments" and to "give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b).

Notably, Defendants fail to cite a single case in this portion of their brief, much less one in which the Third Circuit ordered a new trial. And as this Court has stated, "[t]he Third Circuit has provided little instruction on the standards governing Rule 51(b)(2)." Guynup v. Lancaster Cty., No. CIV.A. 06-4315, 2009 WL 541533, at *7 (E.D. Pa. Mar. 3, 2009) (Baylson, J.). The Third Circuit has never held in any published case that Rule 51(b) requires district courts to share with counsel a full written copy of the anticipated charge. At least one Circuit has explicitly held that Rule 51 does not require judges to provide counsel with a written copy of the jury charge. DeCaro v. Hasbro, Inc., 580 F.3d 55, 65 (1st Cir. 2009) ("Fed.R.Civ.P. 51(b)(1)…does not require the trial judge to supply the parties with a written copy of the instructions before charging the jury").

Defendants also fail to note that the Court held a lengthy colloquy on the afternoon before the Court read the charge to the jury. At that time, the Court explained at length its proposed instructions regarding the First Amendment and Monell. (See N.T. 4/4/18 161-62

(explaining proposed First Amendment and <u>Monell</u> charges)).  Although Defendants complain in their post-trial motions that they did not know the substance of the First Amendment and <u>Monell</u> charges that the court ultimately decided to give before they delivered their closing argument, Rule 51(b) does not require a court to notify counsel of its final decision on how it has decided to instruct the jury.  By its terms, Rule 51(b) requires a court to inform counsel of its "<u>proposed</u> instructions" and give counsel an "<u>opportunity</u> to object" (emphases added).  That the Court did at the charge conference, satisfying Rule 51(b).

Admittedly, the Court did not discuss precisely what types of harm Porter could recover for, although the parties clearly anticipated an instruction on compensatory damages, which was discussed in the context of whether to charge on nominal damages.  (N.T. 4/4/18 145:19-148:2).  The following day, the Court instructed the jury that Porter could recover for physical harm, emotional harm, and loss of past and future earnings as to James Porter.  A review of the transcript shows that the Court essentially read these portions of the Third Circuit model jury instructions, which Defendants had actually requested in their proposed jury instructions prior to trial.  (See Defs.' Proposed Jury Instructions at 2, ECF 74).  Such an omission cannot merit a new trial, when defense counsel requested the charge.

**VII.    Conclusion**

For the reasons stated above, Defendant City of Philadelphia's motion for judgment as a matter of law, a new trial, or remittitur is **DENIED**, and Defendant Chew's motion for judgment notwithstanding the verdict is **GRANTED** in favor of Defendant Chew as to the jury verdict of $7,500 in favor of Plaintiff.  An appropriate order follows.